**Coramae Ella GARY, Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.**

**Civ. A. No. 93–229.**

United States District Court,
District of Columbia.

May 11, 1995.

before a final decision had been reached on any of the issues presented.

Steven Gordon Reade, Diane A. Heim, Charles W. Scarborough, Arnold & Porter, Washington, DC, Gregory Keith Wells, Smallwood & Wells, Landover, MD, for plaintiff Coramae Ella Gary.

Robert John Kniaz, Bruce Paul Heppen, Gerard Joseph Stief, Washington Metropolitan Area Transit Authority, Washington, DC, for defendant Washington Metropolitan Area Transit Authority, a Body Corporate and Politic.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on Defendant Washington Metropolitan Area Transit Authority's ("WMATA") motion for summary judgment. Plaintiff Coramae Ella Gary has brought suit under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, alleging that WMATA retaliated against and constructively discharged Plaintiff because of her complaints of sexual discrimination and harassment.

Defendant asserts a variety of grounds upon which summary judgment should be granted in Defendant's favor. First, Defendant contends that this Court lacks the subject matter jurisdiction to entertain this Title VII suit because Plaintiff's Title VII claims are subject to compulsory and binding arbitration. Second, Defendant argues that WMATA is not liable for the actions of its supervisors under agency law principles. Defendant also asserts the procedural argument that Plaintiff failed to file timely EEOC charges and the substantive argument that Plaintiff has failed to create triable issues of material fact with respect to either her retaliation or constructive discharge claim.

## FACTUAL BACKGROUND

Plaintiff was hired by WMATA in 1983 as a custodian in WMATA's Department of Rail Service. In May of 1987, she became a stock clerk at WMATA's Brentwood facility. Her immediate supervisor at Brentwood was Mr. Charles Brown. Mr. Edward Long was Mr. Brown's supervisor and Plaintiff's second-level supervisor.

In this action, Plaintiff alleges that WMATA retaliated against her because she took the following actions: 1) filed a written complaint with WMATA on February 28, 1990 against Mr. Long, alleging sexual harassment; 2) filed an EEOC charge on May 16, 1990, alleging sexual harassment; and 3) filed an action in District Court in December 1990 against WMATA and Long relating to the sexual harassment.[1]

Plaintiff specifically alleges in her declaration that she was retaliated against by supervisors at three different locations where she worked between 1990 and the time of her alleged constructive discharge on January 28, 1993. In May of 1990, Plaintiff was trans-

---

[1]. This December 1990 action was before this Court. By Order dated December 2, 1992, this Court declined to exercise its pendent jurisdiction and, thereby, dismissed the common law claims alleged in Counts II through VI. In addition, the Court dismissed the Title VII harassment claims as to Defendant WMATA on agency law grounds. By Order dated January 4, 1994, Magistrate Judge Kay, to whom the case was referred for pre-trial purposes and for trial, dismissed the remaining count against Defendant Long with prejudice.

Whether Plaintiff was successful in her underlying sexual harassment suit is not relevant to whether she was retaliated against for her protected activities.

ferred away from her alleged harasser, Edward Long, and assigned to work at the Bus Maintenance facility on Bladensburg Road. In June of 1990, Plaintiff exercised her seniority rights and opted to be transferred to the Montgomery Division facility. She remained at this location for approximately one year before she transferred to the Southeast Division location. In December of 1991, she exercised her seniority rights and transferred back to her original location at the Bus Maintenance facility in Bladensburg.

While at the Bladensburg facility for the first time, Plaintiff alleges that her supervisor Ms. Tompkins, who Defendant concedes was aware of her sexual harassment charges, watched her more closely than other employees and that employees avoided her.

At the Montgomery Division facility, Plaintiff alleges that a meeting was called by two supervisors, William Woodard and Anthony Johnson, during which Mr. Woodard told employees that Plaintiff had previously filed sexual harassment charges against Long and that Plaintiff was a troublemaker. Employees were warned to stay away from her.

Plaintiff alleges that due to the stress from work she was forced to take a week of sick leave in July of 1990. Upon her return, her supervisor Anthony Johnson reprimanded Plaintiff for excessive sick leave absences. Moreover, Plaintiff alleges that Supervisor Woodard told her that he did not want her working at WMATA because of the sexual harassment charges that she had filed and that he would find a way to get rid of her.

Upon her transfer to the Southeast facility, Plaintiff alleges that several supervisors retaliated against her. Supervisor Brown told her that he had heard about the sexual harassment charges and that he did not want her working at Southeast. Supervisor Michael Johnson and Supervisor Gerald Hobbs each stated that he was going to find a way to get rid of her because of the charges.

Over Labor Day weekend in 1991, Plaintiff agreed to work overtime shifts at the Metro Supply Facility. When Plaintiff arrived, Mr. Long, her alleged harasser, was present and Plaintiff was sent home. According to Plaintiff, Supervisor Jorgensen told Plaintiff that he never wanted Plaintiff working at his facility regardless of whether Long was present. Plaintiff filed a grievance over this incident and she received 54 hours of overtime pay in settlement.

Plaintiff did not work from September 12 through September 19, 1991. According to Plaintiff, she was suffering from acute stress disorder related to the hostile environment at work.

Upon her final rotation to Bladensburg, Plaintiff's first paycheck was sent to her prior work location. Plaintiff was permitted to pick up her paycheck at the old location during work hours. Plaintiff further alleges that Supervisor Tompkins said that she did not want Plaintiff working at the facility because of the sexual harassment charges and that Tompkins watched Plaintiff more closely than other employees.

Plaintiff also alleges that an incident surrounding her ability to take time off for her daughter's high school graduation was in retaliation for her sexual harassment charges. Plaintiff alleges that she had previously obtained permission from Supervisor Tompkins to be absent without pay on June 5, 1992 and that Tompkins then revoked this permission. Plaintiff requested the leave from the next two supervisors in the chain of command, Kenneth Crane and Michael Kurtz. Mr. Kurtz told Plaintiff that he would "look into the matter." Plaintiff assumed that she would be denied the day off. According to Plaintiff, she became very upset and WMATA's Medical Office authorized Plaintiff to take sick leave for the rest of the week. Plaintiff attended the graduation.

On June 9, 1992, Plaintiff returned to work for two hours. After that day, she did not return to work due to stress and severe depression which Plaintiff attributes to the retaliation at work. On January 28, 1993, Plaintiff resigned.

## SUMMARY JUDGMENT STANDARDS

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Mere allegations or denials of the moving party's pleadings are not enough to prevent issuance of summary judgment. The adverse party's response to the summary judgment motion must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e).

The Supreme Court set forth the governing standards for issuance of summary judgment in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Celotex,* the Supreme Court recognized the vital need for summary judgment motions to the fair and efficient functioning of the justice system:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1 . . . .
>
> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555. (citation omitted).

■ The plaintiff, as the non-moving party, is "required to provide evidence that would permit a reasonable jury to find" in her favor. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987) (*per curiam* ) (citing *Celotex, supra* ). The moving party is entitled to summary judgment where "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex* at 323, 106 S.Ct. at 2552. Any factual assertions contained in affidavits and other evidence in support of the moving party's motion for summary judgment shall be accepted as true unless the facts are controverted by the non-moving party through affidavits or other documentary evidence. See Local Rule 108(h).

■ In resolving the summary judgment motion, all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). The inferences, however, must be reasonable, and the non-moving party can only defeat a motion for summary judgment by responding with some factual showing to create a genuine issue of material fact. *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993).

## ANALYSIS AND DECISION

### 1. SUBJECT MATTER JURISDICTION

The threshold question is whether this Court has subject matter jurisdiction over Plaintiff's Title VII statutory claims. Defendant claims that Plaintiff was bound to arbitrate her employment discrimination claims pursuant to Section 66(c) of the WMATA Compact.

The Compact was entered into by the District of Columbia, Virginia and Maryland in order to establish WMATA, the government entity responsible for operation of the subway system that serves the District of Columbia Metropolitan area. This Compact was consented to by Congress and is codified in the D.C.Code, § 1–2431.

Section 66(c) of the Compact provides for final and binding arbitration before a board of three arbitrators in cases of labor disputes between WMATA and its employees:

> In case of any labor dispute involving the Authority [WMATA] and such employees where collective bargaining does not result in agreement, the Authority shall submit such dispute to arbitration by a board composed of three persons, one appointed by the Authority, one appointed by the labor organization representing the employees, and a third member to be agreed upon by the labor organization and the Authority . . . . The term "labor dispute" shall be broadly construed and shall include any

controversy concerning wages, salaries, hours, working conditions, or benefits including health and welfare, sick leave, insurance or pension or retirement provisions but not limited thereto, and including any controversy concerning any differences or questions that may arise between the parties including but not limited to the making or maintaining of collective bargaining agreements, the terms to be included in such agreements, and the interpretation or application of such collective bargaining agreements and any grievance that may arise and questions concerning representation.

Defendant contends that this section of the Compact requires Plaintiff to submit to binding arbitration her Title VII claims of retaliation and constructive discharge because these claims are labor disputes within the meaning of the section.

The Supreme Court has addressed the compulsory arbitration of statutory claims in several lines of cases. In making its argument, Defendant relies on the Supreme Court's decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). In opposition, Plaintiff cites *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

In *Gardner–Denver*, the Plaintiff was asserting a claim of discriminatory discharge under Title VII. The employee had previously arbitrated his claim of wrongful discharge under the terms of his collective bargaining agreement. The Court held that the previous arbitration did not defeat the Title VII claim, reasoning that "[t]he distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums." *Id.* at 50, 94 S.Ct. at 1020. Employing similar reasoning, the Court held that the compulsory arbitration clause of a collective bargaining agreement would not preclude a suit to enforce the Fair Labor Standards Act[2] or a Section 1983 claim.[3] The *Gardner–Denver* decision was "widely interpreted as prohibiting any form of compulsory arbitration of Title VII claims." *Prudential Ins. Co. of America v. Lai*, 42 F.3d 1299, 1303 (9th Cir.1994) (citing *Utley v. Goldman Sachhs & Co.*, 883 F.2d 184 (1st Cir.1989), *cert. denied*, 493 U.S. 1045, 110 S.Ct. 842, 107 L.Ed.2d 836 (1990)).

Without reversing *Gardner–Denver*, the Supreme Court in *Gilmer* held that in certain circumstances statutory claims could be subject to binding, compulsory arbitration. In *Gilmer*, the plaintiff, as a condition of his employment as a financial services' manager, registered with the New York Stock Exchange. The Exchange's registration application contained a mandatory arbitration clause which provided that the applicant agreed to arbitrate any dispute arising out of the employment relationship or termination of employment. When the employer terminated the plaintiff, the plaintiff filed a suit under the Age Discrimination in Employment Act ("ADEA"). Pursuant to the Federal Arbitration Act, the Court held that Gilmer was required to arbitrate his ADEA claim:

It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA. Indeed, in recent years we have held enforceable arbitration agreements relating to claims arising under the Sherman Act, 15 U.S.C. §§ 1–7; § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq.; and § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2).... In these cases we recognized that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than judicial, forum."

---

**2.** *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 734, 101 S.Ct. 1437, 1441, 67 L.Ed.2d 641 (1981).

**3.** *McDonald v. City of West Branch*, 466 U.S. 284, 290, 104 S.Ct. 1799, 1803, 80 L.Ed.2d 302 (1984).

*Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3354–55, 87 L.Ed.2d 444 (1985)) (citations omitted).

The Court distinguished *Gilmer* from the *Gardner–Denver* lines of cases (including *Barrentine* and *McDonald*) on three grounds. First, the Court noted that under the *Gardner–Denver* line of cases, the labor arbitrators were only authorized to resolve claims under the collective bargaining agreement and could not resolve the statutory claims. Second, in the collective bargaining agreement context, the claimants were represented by their unions in the arbitration proceedings, which created a "tension between collective representation and individual statutory rights." Third, the *Gardner–Denver* line of cases was not decided under the FAA, which strongly favors arbitration of disputes.

In *Gilmer,* the Court placed the burden on the plaintiff to show that Congress, in enacting the statute under which the plaintiff brought his claims, intended to preclude arbitration of claims under the statute. Gilmer failed to meet that burden and the Supreme Court held that ADEA claims can be made subject to compulsory arbitration. Lower courts have extended Gilmer's holding to Title VII claims. *See, e.g., Prudential Ins. Co. of America v. Lai,* 42 F.3d 1299, 1303 (9th Cir.1994) ("Our circuit has extended *Gilmer* to employment discrimination claims brought under Title VII."); *Alford v. Dean Witter Reynolds, Inc.,* 939 F.2d 229, 230 (5th Cir. 1991) ("[W]e have little trouble concluding that Title VII claims can be subjected to compulsory arbitration.")[4] Section 118 of the Civil Rights Act of 1991, which amended Title VII, indicates that Title VII cases can be disposed of through arbitration:

> Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials and arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title.

§ 118 of Pub.L. 102–166, set forth in notes following 42 U.S.C. § 1981 (Supp.1994).

Based on the above precedent, this Court finds that Title VII claims can be subject to compulsory arbitration. The question before the Court is whether under the circumstances of this case the Plaintiff's Title VII claims should be subject to compulsory arbitration under Section 66(c) of the WMATA Compact. Unlike the *Gardner–Denver* line of cases, this case does not involve a compulsory arbitration clause in a collective bargaining agreement. Nor does it involve a compulsory arbitration clause in an agreement signed by an employee as in *Gilmer.*[5] The Compact contains an arbitration clause mandated by Congress. The legislative history indicates that "all unsettled labor disputes between the parties will be referred to final and binding arbitration." S.Rep. No. 931, 92nd Cong., 2d Sess. 10 (1972) (Senate Report).

In analyzing this "hybrid" case, it is important to recognize the Congressional intent with respect to an employee's rights

---

4. The 5th Circuit's decision in *Alford* was on remand from the Supreme Court, *Dean Witter Reynolds, Inc. v. Alford,* 500 U.S. 930, 111 S.Ct. 2050, 114 L.Ed.2d 456 (1991). The Supreme Court vacated the 5th Circuit's original decision and remanded for the appellate court to review its decision in light of *Gilmer.* In its original decision, the 5th Circuit denied the defendant's motion to dismiss and compel arbitration of the plaintiff's Title VII claims. *Alford I,* 905 F.2d 104 (5th Cir.1990). On remand, the 5th Circuit reversed its earlier decision and found that the Title VII claims were subject to compulsory arbitration. "[T]he Supreme Court's treatment of *Alford v. Dean Witter Renolds, Inc.* indicates the Supreme Court's apparent conclusion that the reasoning of *Gilmer* should be extended to Title VII claims." R. Bales, *A New Direction for American Labor Law: Individual Autonomy and the Compulsory Arbitration of Individual Employment Rights,* 30 Hous.L.Rev. 1863, 1896 (1994).

5. The Supreme Court also addressed the arbitration of statutory claims in the private contract context in what is commonly referred to as the *Mitsubishi* trilogy. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Shearson/Am. Express, Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987).

under Title VII. The Supreme Court recognized:

> In the Civil Rights Act of 1964, Congress indicated that it considered the policy against discrimination to be of the "highest priority." Consistent with this view, Title VII provides for consideration of employment-discrimination claims in several forums. And, in general, submission of a claim to one forum does not preclude a later submission to another. Moreover, the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes.

*Gardner–Denver*, 415 U.S. at 47–48, 94 S.Ct. at 1019 (citations omitted). In enacting the Civil Rights Act of 1991, Congress expressed its concern that Title VII disputes only be arbitrated "where appropriate" and indicated that Section 118, allowing for arbitration, should not be interpreted as supplanting Title VII claims in federal courts:

> The committee emphasizes ... that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII.... The committee does not intend for the inclusion of this section to be used to preclude rights and remedies that would otherwise be available.

HR Rep. No. 40(I) 102d Cong. 1st Sess., reprinted in 1991 U.S.C.C.A.N. 549, 635. Hence, Congress has clearly indicated its intent that the rights of an individual to assert Title VII claims in federal court are not to be taken away lightly.

It is against this backdrop that this Court must determine whether Section 66(c) defeats this Court's jurisdiction. As a first step, the Court must interpret the language of Section 66(c) of the Compact. This Court's ability to exercise its jurisdiction is only circumscribed when a labor dispute is subject to the Compact's mandatory arbitration provisions. The first sentence of Section 66(c) provides: "In case of any labor dispute involving the Authority [WMATA] and such employees where collective bargaining does not result in agreement, the Authority shall submit such dispute to arbitration...." The plain language of this sentence defeats the argument that Plaintiff was required to submit her Title VII claims to mandatory arbitration. A Title VII claim is simply not a dispute that would be subject to "collective bargaining." Only those labor disputes "where collective bargaining does not result in agreement" are to be submitted to arbitration. Moreover, the Authority "shall submit such dispute to arbitration." Here, WMATA has not submitted the claim to arbitration, nor moved to compel arbitration.

The Court feels compelled to recognize that this Circuit has held that plaintiffs' individualized negligent termination claims and breach of contract claims must be submitted to binding arbitration by the plaintiffs pursuant to Section 66(c) of the Compact. See *Sanders v. WMATA*, 819 F.2d 1151, 1156–57 (D.C.Cir.1987) ("For WMATA employees, including appellants, the claim for 'negligent termination' was required to be submitted, if unsettled, to final and binding arbitration" by appellants under Section 66(c)); *Hawthorne v. WMATA*, 702 F.Supp. 285, 287 (D.D.C. 1988) ("Count VI, which alleges that plaintiff's termination and subsequent reinstatement breached his employment contract, must also be dismissed. It is clear that such a 'labor dispute' must be presented to final and binding arbitration under section 66(c) of the Compact. *Sanders*, 819 F.2d at 1156. Here, plaintiff has not alleged, in his complaint or his pleadings, that he has complied with this requirement.") Such individualized claims would also not be the subject of collective bargaining. Thus, this Court's reading of the plain language of Section 66(c) seems to be at odds with that of this Circuit.

Even so, this Circuit has clearly not addressed whether Section 66(c) compels the arbitration of statutory claims. The Court is not left without any relevant guidance. The Second Circuit addressed the issue of whether appellants' prior arbitration pursuant to

the Congressionally-prescribed arbitration clause in the Railway Labor Act barred their claims of discrimination under the Rehabilitation Act.[6] *Bates v. Long Island R. Co.*, 997 F.2d 1028 (2nd Cir.1993); *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993). The Circuit, relying on *Gardner–Denver,* held that it had jurisdiction to entertain appellants' claims of discrimination and that "arbitration should not be the sole avenue of protection, unless Congress has so specified." *Id.* at 1034.[7]

As mentioned before, the legislative history of Title VII indicates that the rights of a plaintiff to pursue Title VII claims in federal court are not to be lightly circumscribed. In Section 66(c), Congress does not specifically provide that statutory claims are to be subject to final and binding arbitration. Moreover, one of the factors upon which the Supreme Court distinguished *Gilmer* from the *Gardner–Denver* line of cases militates in favor of this Court's jurisdiction. The Supreme Court noted that "because the arbitration in those cases [*Gardner–Denver* line] occurred in the context of a collective bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings." *Gilmer,* 500 U.S. at 35, 111 S.Ct. at 1657. The provisions of Section 66(c) provide that the labor organization representing the employees shall appoint one of the three arbitrators and that the labor orga-

nization shall agree with WMATA with respect to another arbitrator.[8] Accordingly, a "tension between collective representation and individual statutory rights" arises as in the *Gardner–Denver* line of cases. *Gilmer,* 500 U.S. at 35, 111 S.Ct. at 1656–57.

In enacting Title VII, Congress sought to ferret out invidious discrimination and deter it in the future. This Court is simply unwilling to find that Congress' enactment of Section 66(c) precludes an employee from pursuing Title VII claims in federal court, with its concomitant discovery rights, absent Congressional specification that arbitration was to be the sole forum for such claims. It seems unlikely that Congress intended to preclude one class of employees, WMATA employees, from filing Title VII claims in federal court.

Based on the foregoing, this Court holds that it has jurisdiction over Plaintiff's Title VII claim.

### 2. AGENCY LAW

■ WMATA next contends that an employer is only liable for the discriminatory conduct of its supervisors if it knew or should have known of the circumstances surrounding the alleged violations of Title VII by the supervisors. According to Defendant, there is no evidence to support its liability to Plaintiff under this standard. Defendant, howev-

---

**6.** The arbitration clause of the RLA provides:

The disputes between an employee ... and a carrier or carriers growing out of grievances or out of interpretation or application of agreements concerning rates of pay, rules, or working conditions ... may be referred by petition of the parties or by either party to the appropriate division of the [National Railroad] Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

45 U.S.C. § 153 First (i).

**7.** *But see Hirras v. National R.R. Passenger Corp.,* 10 F.3d 1142 (5th Cir.1994) ("we do not find *Bates* persuasive authority for the proposition that Hirras's Title VII claim need not be submitted to arbitration" pursuant to the RLA) (vacated and remanded, —— U.S. ——, 114 S.Ct. 2732, 129 L.Ed.2d 855 (1994)). This case, however, was vacated and remanded by the Supreme Court for the 5th Circuit to reconsider its ruling in light of *Hawaiian Airlines, Inc. v. Norris,* —— U.S. ——, 114 S.Ct. 2239, 129 L.Ed.2d 203

(1994). In *Norris,* the Supreme Court held that the arbitration provision of the Railway Labor Act did not preempt the plaintiff's state law claims for wrongful discharge in violation of public policy and in violation of the Hawaii Whistleblower Protection Act. Based on the Court's interpretation of the language of the RLA's arbitration provision and the Congressional intent behind the provision, the Court held that only state law claims dependent on the interpretation of a collective bargaining agreement are preempted. The Supreme Court's treatment of *Hirras* suggests that it believes that the RLA's arbitration provision should not be read to require the mandatory arbitration of a Title VII claim.

**8.** "[T]he Authority shall submit such dispute to arbitration by a board composed of three persons, one appointed by the Authority, one appointed by the labor organization representing the employees, and a third member to be agreed upon by the labor organization and the Authority."

er, has incorrectly stated the standard for employer liability in this case.

In *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that employers are not strictly liable under Title VII for the acts of their supervisors in all circumstances. The Supreme Court was confronted with the question of employer liability for supervisors' actions in the context of a "hostile work environment" sexual harassment case, as opposed to a "quid pro quo" case in which the harassment is directly linked to the grant or denial of employee benefits.

■ In the *quid pro quo* harassment context, the employer is held strictly liable for the actions of the supervisor because the "harasser, by definition, wields the employer's authority to alter the terms and conditions of employment—either actually or apparently." *Karibian v. Columbia University,* 14 F.3d 773, 777 (2nd Cir.1994), *cert. denied,* —— U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). The Eleventh Circuit detailed the rationale behind the distinction between standards of employer liability in *quid pro quo* and hostile work environment claims:

> In a *quid pro quo* case, the corporate defendant is strictly liable for the supervisor's harassment ... In such a case, the supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee. Therein lies the *quid pro quo.* In that case, the supervisor uses the means furnished to him by the employer to accomplish the prohibited purpose. He acts within the scope of his actual or apparent authority to hire, fire, discipline or promote.
>
> Strict liability is illogical in a pure hostile environment setting ... [in which] the supervisor acts outside the scope of actual or apparent authority to hire, fire, discipline, or promote. Corporate liability, therefore, exists only through *respondeat superior* ... where the corporation knew or should have known of the harassment and failed to take prompt remedial action.

*Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989) (citations omitted).

■ In a retaliation case, as in the *quid pro quo* case, the employer should be held strictly liable. Retaliation, by definition, requires that the victim be subject to "adverse employment action." Supervisors wield their "employer-delegated authority" to "fire and discipline" in taking adverse action against an employee. A retaliation claim is linked to the denial of employee benefits.

In this case, Plaintiff alleges that supervisors retaliated against her for her prior sexual harassment claims by altering and threatening to alter the conditions of her employment. According to Plaintiff, supervisors told her that they would "get rid of her" and disciplined her either directly (reprimand for excessive sick leave) or indirectly (e.g., overtime incident/paycheck incident). The supervisors acted within the scope of their actual or apparent authority to "hire, fire, discipline or promote."

Based on the foregoing, the Court rejects WMATA's "agency law" theory for dismissal and holds that strict liability is the proper standard of employer liability under these circumstances.

## 3. RETALIATION CLAIM

Defendant contends that Plaintiff did not file a timely complaint with the Equal Employment Opportunity Commission ("EEOC") with respect to many of Plaintiff's claims for retaliation and that, accordingly, these claims should be dismissed. In addition, Defendant argues that, with respect to the retaliation claims for which a timely EEOC complaint was filed, these claims do not amount to actionable retaliation.

■ Prior to filing a Title VII suit, an individual must first file an administrative complaint with the EEOC. *Shehadeh v. Chesapeake & Potomac Tel. Co.,* 595 F.2d 711, 717 (D.C.Cir.1978). Exhaustion of this administrative remedy is a prerequisite to judicial relief. *Siegel v. Kreps,* 654 F.2d 773, 776–77 (D.C.Cir.1981). Pursuant to 29 U.S.C. § 626(d), the complaint must be filed within 180 days after the "alleged unlawful employment practice occurred." This time limit is treated as a statute of limitations,

subject to waiver, estoppel and tolling. *Kizas v. Webster*, 707 F.2d 524, 543 (D.C.Cir. 1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173. Thus, as a general rule, a Title VII claim can only be comprised of misconduct that the Plaintiff complained of in a timely-filed administrative complaint before the EEOC. *Shehadeh* at 724. The purpose behind this rule is to protect defendants against having to defend against stale claims. *Delaware State College v. Ricks*, 449 U.S. 250, 256–57, 101 S.Ct. 498, 503–04, 66 L.Ed.2d 431 (1980).

An exception exists, however, when a "continuing discriminatory employment practice is alleged." *Shehadeh* at 724. Where the discriminatory practice is continuing in nature, "the administrative complaint may be timely filed notwithstanding that the conduct impugned is comprised in part of acts lying outside the charge-filing period." *Id.* The legislative history of Title VII supports the "continuing violation" exception to the 180 day time limit. Congress indicated that where continuing violations exist, the required time periods for filing administrative complaints should run "from the last occurrence of the discrimination and not from the first occurrence."[9] Under the continuing violation theory, "it is the ongoing program of discrimination, rather than any of its particular manifestations, that is the subject of attack." *Shehadeh* at 724–25. Such an ongoing program of discrimination can be directed against one employee "as readily as against a sizeable class of employees." *Id.* at 725, n. 73.

The D.C.Circuit has held:

To be considered continuing in nature ... the discrimination may not be 'limited to isolated incidents but [must] pervade[ ] a series or pattern of events which continue to within' the filing period.

*Milton v. Weinberger*, 645 F.2d 1070, 1076 (D.C.Cir.1981) (citation omitted). Specific, unrelated incidents of discrimination do not constitute a continuing violation. *Id.* The remote claims must be connected to the claims for which timely administrative complaints were filed. *Id.* at 1077.

There is no dispute that Plaintiff filed an EEOC charge on June 26, 1992. Defendant contends that all of Plaintiff's retaliation claims for events which occurred 180 days before June 26, 1992 must be dismissed. Under this theory, the claims for events alleged to have occurred during Plaintiff's first assignment to Bladensburg, her assignment to the Montgomery Division, and her assignment to Southeast Division would be barred. Plaintiff counters that she has raised triable issues of material fact concerning the application of the continuing violation theory.

Defendant asserts two arguments for why the continuing violation theory is not applicable. First, Defendant argues that the alleged retaliatory actions that actually occurred within the 180 day period do not constitute actionable retaliation. In order to satisfy the requirements of the continuing violation theory, Plaintiff must show that at least one adverse employment action occurred within the 180 day charge-filing period. Second, Defendant argues that the remote claims alleged by Plaintiff were unrelated to the claims falling within the charge-filing period.[10]

To make out a prima facie case of retaliation, an employee must show the following:

that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action.

*Manoharan v. Columbia U. Col. of Phys. & Surgeons*, 842 F.2d 590, 593 (2nd Cir.1988).

There is no dispute that Plaintiff was engaged in a protected activity. Defendant also does not challenge that Plaintiff has provided evidence sufficient to create triable issues of material fact with respect to the

9.  118 Cong.Rec. 7167 (1972) (conference report).

10.  The Court need not even reach Defendant's second argument because Defendant's first argument disposes of Plaintiff's retaliation claims, both the remote and timely claims. .

"awareness" and "causal connection" elements. What Defendant challenges is the adverse employment action prong of Plaintiff's prima facie case with respect to the two incidents which occurred within the charge-filing period—the "graduation" and "paycheck" incident.

■ The Court recognizes that an employee need not be fired, demoted or transferred to make out a case of retaliation. The D.C.Circuit has held that "repeated threats against individuals in response to their exercise of protected rights may amount to harassment sufficient to establish a claim of retaliation." *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1424 (D.C.Cir.1988) (citing *Rogers v. McCall*, 488 F.Supp. 689, 697 (D.D.C.1980)). It would contravene the purpose of Title VII to hold that there is no adverse employment action short of an actual firing or demotion.

■ The graduation incident and the paycheck incident do not constitute adverse employment actions. With respect to the graduation incident, Plaintiff alleges in her declaration that she confronted her immediate supervisor, Ms. Tompkins, when she discovered that she was not scheduled to have June 5, 1992 off, the date of the graduation. She then consulted supervisors higher in the chain of command. Plaintiff concedes that the highest supervisor that she spoke to, Mr. Kurtz, never officially denied her the day off, but said that he would "look into the matter." Plaintiff contends that she "took this [Mr. Kurtz's statement] to mean that I was being denied the day off." Plaintiff then became upset and had to take sick leave.

As Plaintiff concedes, Plaintiff went to her daughter's graduation and got sick pay on that day. Given that Plaintiff was never even denied permission to be excused from work, this incident certainly cannot amount to an adverse employment action.

■ Plaintiff's claim that the "paycheck" incident amounts to actionable retaliation is also devoid of merit. When Plaintiff transferred from the Southeast facility to the Bladensburg facility in December of 1991, her first paycheck after the transfer was sent to the Southeast facility. Plaintiff does not con-

test that she was released from work on December 31, 1991 to pick up her paycheck at the Southeast facility. This was the only time that her paycheck was sent to the wrong location. Such an administrative mistake does not rise to the level of an adverse employment action.

For the Court to hold that the graduation incident and the paycheck incident amount to an adverse employment action would be to turn Title VII on its head. These claims constitute an abuse of Title VII. Plaintiff simply cannot demonstrate that she suffered any harm.

■ Based on the foregoing, the Court grants Defendant's motion for summary judgment on the retaliation claims. Only two retaliatory incidents alleged by Plaintiff fall within the 180 day charge-filing period and these two incidents fail to constitute actionable retaliation. The continuing violation theory only saves remote claims which fall outside of the charge-filing period where the remote claims are connected to timely filed claims. Given that there are no meritorious timely-filed claims, Plaintiff cannot rely on the continuing violation theory to save her remote retaliation claims.

### 4. CONSTRUCTIVE DISCHARGE CLAIM

Defendant contends that Plaintiff's constructive discharge claim should be dismissed because Plaintiff did not file a timely charge with the EEOC alleging that she was constructively discharged. As mentioned before, filing an EEOC charge within 180 days of the "alleged unlawful employment practice" is a prerequisite to judicial relief.

There is no dispute that on July 21, 1993 Plaintiff filed an EEOC charge alleging that she was constructively discharged. It is also agreed that the last date that Plaintiff worked was on June 9, 1992 and that she resigned on January 28, 1993. At a December 1, 1992 hearing before the Court with respect to Plaintiff's first case (Title VII sexual harassment case) against Defendant Long and Defendant WMATA, Plaintiff's attorney stated that he planned to file an amended complaint charging retaliatory dis-

charge against Defendant WMATA because Plaintiff "may have to quit." [11]

▇▇▇ Defendant first contends that Plaintiff's EEOC charge was untimely because Plaintiff's claim for constructive discharge accrued on June 9, 1992, triggering the running of the 180 day charge-filing period. Defendant goes on to state that at the latest the action accrued on December 1, 1992, when Plaintiff's counsel advised the Court of his intention to add the constructive discharge claim. Plaintiff counters that the 180 day statute of limitations did not begin to run until January 28, 1993, the date of her formal resignation.[12]

▇▇▇ This Court does not accept Defendant's argument that the statute of limitations necessarily began to run on June 9, 1992. It is a question of fact whether Plaintiff knew or should have known of her inability to return to work on June 9, 1992.

▇▇▇ The Court recognizes that it is well-established that "procedural niceties should not be employed to impede a Title VII claimant from obtaining a judicial hearing on the merits." *Diem v. City and County of San Francisco,* 686 F.Supp. 806, 810 (N.D.Cal.1988). But, there is no doubt that by December 1, 1992, when Plaintiff's attorney advised the Court of his intention to amend the complaint to add a constructive discharge claim, Plaintiff knew of her claim. Accordingly, at the latest, the 180 day statute of limitations began to run in December of 1992 and Plaintiff's July 21, 1993 EEOC complaint was untimely.

▇▇▇ The Court rejects Plaintiff's theory that the statute of limitations did not begin to run until she actually resigned. Under this theory, a plaintiff could set the date on which the statute of limitations would begin to run, no matter how much time had elapsed since the acts complained of.

Based on the foregoing, the Court grants Defendant's motion for summary judgment on the constructive discharge claim on the grounds that Plaintiff did not file a timely EEOC charge.

An appropriate order accompanies this memorandum opinion.

## ORDER

This matter comes before the Court on Defendant Washington Metropolitan Area Transit Authority's ("WMATA") motion for summary judgment. After full consideration of the papers and oral argument in support of and in opposition to the motion, the Court hereby **ORDERS** as follows:

1. Defendant's motion for summary judgment on compulsory arbitration grounds is **DENIED.**

2. Defendant's motion for summary judgment on agency law grounds is **DENIED.**

3. Defendant's motion for summary judgment with respect to the retaliation claims is **GRANTED.**

4. Defendant's motion for summary judgment with respect to the constructive discharge claim is **GRANTED.**

Accordingly, the case is hereby dismissed with prejudice.

▇▇▇▇▇▇▇▇

---

**11.** The Court: What is new that you have that you are going to put in [an amendment] after I labored on this case? What is it now that you are going to charge against WMATA?
Mr. Wells: Retaliatory discharge, your Honor.

\* \* \* \* \* \*

The Court: ... You are going to have a retaliatory discharge against WMATA because she was taken off from the job?
Mr. Wells: She may have to quit.
See Defendant's Attachment 12 to Motion for Summary Judgment.

**12.** As an alternative argument, Plaintiff contends that even if the date of constructive discharge is deemed to be June 1992, the claim is not time barred because her June 1992 EEOC charge covers her constructive discharge claim. This June 1992 EEOC charge, however, does not allege that she was constructively discharged. Rather, it alleges only harassment and retaliation. The Court finds that Plaintiff's decision to file a second EEOC charge in July of 1993 alleging constructive discharge constitutes a concession that the June 1992 charge did not encompass the constructive discharge claim.